The issue in this case is whether the trial court erred in granting the defendants' summary judgment motions in this wrongful death action involving a drowning after the decedent allegedly hit a submerged object.
This case presents once again for our consideration the responsibility of a landowner, in this case a city, for a drowning that allegedly occurred at an outdoor recreational area. Also presented is a question of the liability of the company that constructed the boardwalk from which plaintiff's decedent apparently dived and hit a submerged object. The trial judge entered summary judgment for both defendants, the City of Gadsden (the landowner), and Scott Bridge Company, Inc. (the construction company), and plaintiff appealed. We affirm.
 FACTS
We use plaintiff's statement of the facts substantially as our own. Lizzie Poole's son, Robert L. Jenkins allegedly drowned on June 18, 1986, at a new dock and boardwalk constructed on the Coosa River in Moragne Park in Gadsden, Alabama (hereinafter the "City"). The City owned or controlled Moragne Park, a public park in the City, and prior to the death of Poole's son, the City had contracted with Scott Bridge to construct and erect a boardwalk and docks in the park along the banks of the Coosa River. Poole claimed that her son drowned after diving from the boardwalk into the river, and striking his head on a submerged object. The City furnished no employees or materials in the construction of the dock. Prior to its construction, the City made no investigation to determine the existence of any objects below the surface of the water; however, probes were made to determine the depth of the water in the area by the use of a surveying rod. No submerged objects were found. At the point where the projections on the boardwalk are located, approximately 32 feet from the bank of the river, the water was 12 to 13 feet deep. The project was intended to remove two existing piers that were in a deteriorating condition and to replace them with a boardwalk for pedestrians, a floating dock for boaters, and an area for people to fish. No provisions were made for swimming or diving. The boardwalk was public and was available for use by pedestrians, boaters and fishermen. No lifeguard supervision was provided. There was a three-foot high railing on the fixed upper portion of the boardwalk project, which made direct access to the water from the boardwalk more difficult. Additionally, there were one or more floating piers that could be reached from the boardwalk by opening a gate and descending a ladder to the water level of the Coosa River. These were designed for boating access to and from the boardwalk area. The City claimed to have no knowledge of any person's having struck any submerged object in the water in the vicinity of the boardwalk prior to the death of Poole's son.
Moragne Park had been owned by the City and used as a public park for over 20 years. At the time the boardwalk project was initially discussed, the City had two small piers situated on the Coosa River at Moragne Park. The intent and purpose of the project were to provide an outdoor *Page 512 
recreational area for use of the general public in recreational activities. The City had always discouraged swimming in the area. When the old piers were in existence, there were several signs posted that stated "no swimming." After the boardwalk project was completed, the City had posted signs stating "Swim at Your Own Risk/No Lifeguard on Duty"; from time to time these signs disappeared and presumably were stolen, but the City attempted to maintain such signs on the boardwalk project.
Poole filed a counter-affidavit of Roy Goodson, the mortician who prepared the body of Poole's son for burial. In preparing the body, he observed that the decedent had sustained a severe blow to the top of his head consistent with a person's diving in the water and striking his head on a submerged object. In 19 years of practice as a mortician, Goodson had observed numerous bodies that had sustained similar blows to the head, and the condition observed on Poole's son was consistent with other similar injuries. Goodson's conclusion was that Poole's son had sustained a severe blow to the top of his head at or near the time of death.
The City owned or controlled Moragne Park, where the drowning allegedly occurred. The City and Scott Bridge constructed an elaborate dock and boardwalk for use by the general public. The City posted warning signs but did not provide any lifeguard supervision. No inspection was performed to determine the existence of any submerged objects that could create hazards to the general public.
 I
Appellant argues that the provisions of § 35-15-1 et seq. ("Duty of Care Owed Persons on Premises for Sporting or Recreational Purposes") should not apply to municipal lands. She argues that the intent of those provisions of law was to promote development of lands for recreational purposes, not to encourage cities to develop public parks, and that it would intrude upon § 11-47-190 to enlarge upon the substantive immunity doctrine. She further contends that should § 35-15-1
apply, construction of the dock and boardwalk was a "positive act" that created a new "hidden danger, trap or pitfall" that a swimmer or diver, in the exercise of reasonable care and skill, could not avoid, and that if the depth of the water is such that one diving into the water could strike his head, or if there exists submerged trees or stumps that would pose a similar hazard, the defendants would be under a duty to warn members of the general public, to remove any submerged obstructions, or to mark them and warn the public of the danger.
She concedes that the submerged objects would pose no danger to life in the absence of the new boardwalk and dock, and that the City would have little if any, duty as long as the riverand bank remained in its natural condition, but argues that when the City and Scott Bridge constructed the dock and boardwalk and permitted members of the general public to dive and swim from it, they created a new hazard that did not previously exist, and thus, by positive act created a new hidden danger and, at a minimum, owed a duty to warn the general public.
Plaintiff also contends that if we apply the foreseeability test of duty this Court used in Havard v. Palmer BakerEngineers, Inc., 293 Ala. 301, 307, 302 So.2d 228, 232 (1974), overruled in part by Ex parte Insurance Co. of North America,523 So.2d 1064 (Ala. 1988), we would reverse the summary judgment.
 II
One of the plaintiff's major arguments is that the provisions of § 35-15-1 et seq., do not apply. It is quite obvious that they do. Section 35-15-21(1) defines "Owner" as follows: "Anypublic or private organization of any character, including a partnership, corporation, association, any individual, or any federal, state or local political subdivision or any agency or any of the foregoing having a legal right of possession of outdoor recreational land." (Emphasis added).
Sections 35-15-1 through -5 define and limit the duties of an owner of recreational *Page 513 
land in relation to a person using the premises for recreational purposes. An owner, whether public or private, owes no duty to users of the premises except for injury caused by a willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.
Sections 35-15-20 through -28, adopted in 1981, apply to owners of noncommercial public recreational land, such as the City here, and provide such landowners with even greater protections than §§ 35-15-1 through -5. It is our opinion that the City of Gadsden was intended to be shielded, and was shielded, from liability, based on the facts and circumstances of this case. Cf. Clark v. Tennessee Valley Authority,606 F. Supp. 130 (N.D.Ala. 1985) (federal district judge, applying Alabama law, found TVA not liable to a fisherman whose boat went over a spillway); Grice v. City of Dothan, 670 F. Supp. 318
(M.D.Ala. 1987) (Alabama's recreational and outdoor land statute was not subject to an exception for minors, and the City of Dothan was shielded from liability because of statute's provisions).
The facts of this case are similar to the facts in Glover v.City of Mobile, 417 So.2d 175 (Ala. 1982). There, the City built a pier, bulkheads, and a pavilion that abutted the river. Glover's minor son drowned while swimming next to the pavilion. Glover claimed that the area was an attractive nuisance because of the accessibility and alluring nature of the water and that the City should have inspected and undertaken to remove or lessen the dangers posed by deep water and whirlpools — claims similar to the ones made here. In that case, this Court applied the provisions of § 35-15-1 and the common law rule applicable to licensees, and held as follows:
 "Both the statute and the Fowler decision [W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 165 So.2d 375 (1963)] were considered and approved in Wright v. Alabama Power Company, 355 So.2d 322 (Ala. 1978), wherein this Court held:
 " 'As we read the Fowler decision, it stands for the proposition that a landowner will generally owe no duty to warn a licensee of a potentially dangerous condition unless he does some positive act which creates a new hidden danger, pitfall or trap, which is a condition that a person could not avoid by the use of reasonable care and skill. [Cite omitted.] Otherwise, a landowner has the right to make use of his land as he may see fit. [Cite omitted.] The licensee's entrance on the land carries with it no right to expect the land to be made safe for his reception, but he must assume the risk of whatever may be encountered. [Cites omitted.] Once he is there, the law only requires the landowner to refrain from wantonly, maliciously or intentionally injuring him; in other words, the landowner is not liable unless he does some act which goes beyond mere negligence.'
 "Wright v. Alabama Power Company, at 355 So.2d 325."
417 So.2d at 178.
Even if plaintiff had any evidence to prove her claim that defendants created a hazardous condition by failing to remove submerged objects, the law would still require a summary judgment in this case. Many Alabama summary judgment cases have involved hazardous conditions hidden by water. In Alabama GreatSouthern R.R. v. Green, 276 Ala. 120, 159 So.2d 823 (1964), the landowner left metal spikes beneath the surface of the water. In Cobb v. Lowe Manufacturing Co., 227 Ala. 456, 150 So. 687
(1933), a submerged culvert sucked in the minor and caused a drowning. Several other cases involve slimy sides or sticky bottoms that caused death. These include Locke v. Liquid AirCorp., 725 F.2d 1331 (11th Cir. 1984); Cox v. Alabama WaterCo., 216 Ala. 35, 112 So. 352 (1927); Earnest v. Regent Pool,Inc., 288 Ala. 63, 257 So.2d 313 (1972).
Scott Bridge is one more step removed from liability in this case than the City of Gadsden. The City was the owner of the premises and was in control of the premises at the time of the injury. There is no evidence that Scott Bridge did anything *Page 514 
other than follow the plans and specifications given to it by the City. While plaintiff argues that the facts in this case are similar to those in Havard insofar as the duty owing from Scott Bridge to the decedent is concerned, we cannot agree. A good review of the law regarding the relationship of a person or entity in the position of Scott Bridge is contained in Howev. Bishop, 446 So.2d 11 (Ala. 1984), and Zeigler v. BlountBrothers Construction Co., 364 So.2d 1163, 1167 (Ala. 1978). In those cases, this Court discussed and distinguished the Havard
rule. We are of the opinion that the Havard rule is not applicable in this case.
Based on the foregoing, we hold that the judgments of the trial court are due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.